## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BUSINESS ADVISORS GROUP, LLC,
doing business as TRANSWORLD
BUSINESS ADVISORS OKCSW,

     *Plaintiff,*

v.                               Case No. 23-1050-EFM

WICHITA ATTENDANT CARE
SERVICES, LLC, et al.,

     *Defendants.*

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgment (Doc. 61) filed by Defendants Wichita Attendant Care Services, LLC ("WACS") and Christine Bacci. Plaintiff Business Advisors Group, LLC, doing business as Transworld Business Advisors OKCSW ("Transworld"), brought suit against Defendants alleging breach of contract, breach of the duty of good faith and fair dealing, and an alternate claim of unjust enrichment/quantum meruit arising out of a marketing agreement between the parties. Defendants ask this Court to grant them summary judgment on all of Plaintiff's claims. For the reasons stated below, the Court grants Defendant's motion in part and denies it in part.

## I.    Factual and Procedural Background[1]

### A.    The Parties

Defendant WACS is a family-owned LLC that provides non-medical, in-home services to seniors throughout southeast Kansas. WACS has three members: Defendant Christine Bacci, Steven Bacci, and Roxanne Finley. Christine and Steven Bacci are married, and Roxane Finley is Christine's sister. The Baccis own several other businesses in addition to WACS.

Plaintiff Transworld is a franchise that assists businesses with marketing and selling their business. Gary Schroeder, as a franchisee, is the sole owner of Transworld. It is uncontroverted that Transworld only employs Gary Schroeder. However, Transworld asserts that Wesley Schroeder, Gary Schroeder's son, was a named broker for Transworld during the relevant timeframe of this dispute.

### B.    The Marketing Agreement

The parties' interactions began when Transworld sent a solicitation letter to WACS advertising that it could assist in marketing and selling WACS. WACS responded to the letter in August 2021 expressing interest and telling Transworld it would like to sell for $12 million.

On October 6, 2021, Transworld and WACS entered into a Marketing Agreement in which Transworld would market WACS to potential buyers. The Marketing Agreement indicates that WACS has annual sales of $10 million and $2 million in discretionary earnings and contemplates a total sales price of $12.9 million. This number was derived from WACS's request for $12 million in net proceeds in any sale. Transworld then added an approximate value of its fees to arrive at $12.9 million.

---

[1] The facts are those uncontroverted by the parties unless otherwise indicated.

After Transworld entered into the Marketing Agreement with WACS, in October 2021, Transworld developed an investment prospectus in the form of an executive summary and marketed WACS to over 100 pre-vetted, qualified purchasers. Transworld listed WACS for sale in November 2021 and set the listing price at $14.9 million. Transworld marketed WACS relying on the information provided by WACS. Transworld represented to potential suitors that WACS would "excite even the most scrutinizing buyer." Transworld advertised that WACS has a "bright future" with potential revenue growth.

Transworld engaged with many potential qualified businesses, negotiating and executing 11 non-disclosure agreements ("NDAs"). The 11 potential buyers who signed NDAs were offered letters of intent ("LOI") to purchase WACS. Transworld facilitated meetings between these potential suitors and WACS personnel.

Ultimately, after an in-person meeting with WACS and the CEO of one potential suitor— New Day—WACS and New Day signed an LOI. The LOI contemplated that New Day would purchase WACS for $12 million. It also contained a 90-day exclusivity clause with an option to extend for 30 days. The LOI between WACS and New Day did not require WACS to sell to New Day. When WACS entered the LOI with New Day, New Day began its due diligence process of investigating WACS's value and books. Transworld pulled WACS off the market pursuant to the LOI's exclusivity clause.

New Day never made a formal offer to purchase WACS, and the LOI expired in April 2022. Likewise, the Marketing Agreement between Transworld and WACS expired without a sale in October 2022. However, the parties' interactions in the context of New Day's interest in purchasing WACS led to the present dispute.

C.     **Add Backs**

Before entering into the Marketing Agreement and during the parties' initial conversation about selling WACS, Transworld explained to WACS the concept of "add backs." Add backs are business expenses that a purchaser or new owner would not necessarily accrue. It is not unusual for small businesses to have personal expenses or other businesses' expenses co-mingled with the small business's finances that would be identified as add backs. These add backs must be accounted for in a business valuation.

Transworld relies on its customers to provide information about their business's add backs. Schroeder has a mental checklist he uses to help sellers identify these add backs. But generally, Transworld tells sellers to identify any expenses that a new owner would not otherwise have or need. Before entering into the Marketing Agreement, Transworld asked WACS how much its add backs would be.

Prior to signing the Marketing Agreement, WACS provided Transworld with its income statements and summary notes about its identified add backs. The summary of WACS's add backs showed a value of $250,000 for 2019, $755,000 for 2020, and $889,410 for 2021. When Transworld received this initial valuation of add backs, it did not have any recommendations for WACS.

After signing the Marketing Agreement, WACS identified more add backs. These included its 2019-2021 profit and loss statements, balance sheets, and a document that listed 11 additional businesses in operation within WACS's books. These showed that the Baccis spent $450,000 on a remodeling project for another business and $250,000 on a personal home remodel. This second round of add backs included an additional $224,621 for 2019, $1,008,815 for 2020, and $1,165,483 for 2021. This is highly atypical of companies in the market.

## D.     Withdrawal

Because of the New Day/WACS LOI's exclusivity clause, Transworld pulled WACS off the market when the LOI was signed. This was to facilitate New Day's due diligence inspection of WACS's financials. During this period, Christine Bacci came to believe that WACS was worth more than $12 million. She communicated this to Transworld via two emails.

In a January 25, 2022 email, Christine Bacci communicated, among other things, that after reviewing WACS's books she believed that the purchase price for WACS should be $14.58 million. Christine Bacci emailed Schroeder again on February 2, 2022, stating that $12 million "is just not the number that I am willing to sell for anymore" and that the minimum that WACS should sell for is $13.9 million.[2] Schroeder believed that this constituted a de facto withdrawal from the market because WACS was pricing itself out of the market.

In April of 2022, after the New Day LOI expired, Transworld emailed WACS asking it to extend the Marketing Agreement.

## E.     Procedural Background

Transworld filed its Complaint on April 3, 2023, alleging that WACS breached the Marketing Agreement and seeking to recover under the agreement's liquidated damages provision. WACS filed this Motion for Summary Judgment on April 19, 2024. Transworld filed a timely response and WACS timely replied. The Motion is fully briefed and ripe for the Court's ruling.

---

[2] Christine Bacci asserts that this number is a typo and the number she meant to communicate was $12.9 million, the total purchase price identified in the Marketing Agreement.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[6] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[8]

The Marketing Agreement provides that it is governed by the laws of the State of Kansas. The parties do not dispute the applicability or enforceability of that provision. Thus, the Court will apply Kansas law.

## III.    Analysis

Transworld alleges that WACS breached the Marketing Agreement and seeks recovery under three theories. First, Transworld alleges WACS breached Sections 4 and 7 of the Marketing Agreement. Second, Transworld alleges WACS breached its duty of good faith and fair dealing

---

[3] Fed. R. Civ. P. 56(a).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

when it breached Sections 4 and 7 of the Marketing Agreement, preventing Transworld from receiving the fruits of the labor performed under the agreement. Finally, Transworld submits that it is entitled to recovery based upon an unjust enrichment/quantum meruit theory because it conferred a benefit on WACS that WACS accepted without compensating Transworld. WACS seeks summary judgment on all three of Transworld's theories.

**A.    Transworld's Breach of Contract Claim**

Transworld alleges WACS withdrew from the market after entering the LOI with New Day, violating Section 4(c) of the Marketing Agreement, which provides:

> 4. Seller shall pay to Broker, as compensation or liquidated damages, **8% of the Total Sales Price plus an additional 4% of all proceeds over and above $12,900,000 with a minimum of $75,000.00** if any of the following occur.
> . . .
> c. Seller withdraws Business for sale, seeks to terminate, or terminates this Agreement prior to the end of the Term; . . . .

WACS asserts that it is entitled to summary judgment on this claim because it did not withdraw from the market and because the liquidated damages provision is an unenforceable penalty.

*1.    Withdrawal under Section 4*

WACS asserts several facts to demonstrate that it did not withdraw from the market. It offers the uncontroverted fact that neither email sent by Christine Bacci states that WACS is withdrawing from the market. It further submits the uncontroverted fact that neither email says that the only price WACS would accept was $14.58 million. WACS points out that Transworld did not communicate to WACS that it believed WACS had withdrawn from the market. WACS asserts that Transworld continued to market WACS after the emails and even after the New Day LOI expired. Further, it offers that Transworld directed its efforts to extending the Marketing

Agreement with WACS after the alleged withdrawal. These facts, WACS asserts, conclusively demonstrate that it did not withdraw from the market.

Transworld responds by offering several facts to demonstrate that WACS did withdraw from the market. Transworld acknowledges that Christine Bacci's emails do not explicitly state that WACS is withdrawing from the market. However, Transworld asserts that the clear implication of the emails is that the minimum WACS should sell for is $13.9 million. And by insisting on this price, WACS was pricing itself out of the market which constituted a de facto withdrawal from the market. Finally, Transworld asserts that WACS's words and actions following the emails made WACS's withdrawal clear.

Transworld alleges that after these emails, WACS stopped cooperating with Transworld. But, most significantly, Transworld asserts that WACS expressly told Schroeder not to relist or further market WACS. WACS objects that this statement is inadmissible hearsay. It is well established that "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment."[9] However, if Schroeder's testimony is to be believed, then this statement is excluded from the definition of hearsay as an opposing party's statement under Fed. R. Evid. 801(d)(2).

Schroeder is uncertain which of the Baccis told him that Transworld cannot further market WACS. But if he testifies that Christine Bacci made the statement, Fed. R. Evid. 801(d)(2)(A) would apply. This exception provides that a statement made by an opposing party in an individual

---

[9] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citation omitted).

capacity is excepted from the definition of hearsay.[10] Christine Bacci is a named party, and the statement is offered against her and WACS.

And if he testifies that Steven Bacci made the statement, Fed. R. Evid. 801(d)(2)(C) would apply. Schroeder testifies that around this same time, he was directed to only communicate with Steven Bacci regarding the WACS transaction. As the person with whom WACS directed Schroeder to communicate, Steven Bacci was "authorized" to "make a statement concerning" the Marketing Agreement.[11] Thus, although Schroeder is not certain which of the Baccis told him not to relist or further market WACS, a statement to that effect by either Bacci is not hearsay and admissible at trial.

Transworld's breach of contract claim under Section 4(c) of the Marketing Agreement hinges upon whether WACS withdrew from the market. Here, there are genuine disputes of fact that are necessary to decide whether WACS did in fact withdraw: the parties dispute what Christine Bacci's email communicated regarding withdrawal, the degree to which WACS cooperated with Transworld following those emails, and what the Baccis communicated to Transworld about relisting WACS after the New Day LOI expired. Whether WACS did in fact withdraw is material to the breach of contract claim. Because there are genuine disputes of fact as to whether WACS withdrew from the market, summary judgment on Transworld's breach of contract claim under Section 4(c) is inappropriate.

---

[10] *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following condition[] is not hearsay . . . [t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity.").

[11] *See* Fed. R. Evid. 801(d)(2)(C) ("A statement that meets the following condition[] is not hearsay . . . [t]he statement is offered against an opposing party and . . . was made by a person whom the party authorized to make a statement on the subject.").

## 2.  Liquidated Damages Provision under Section 4

WACS submits that the liquidated damages provision in Section 4 of the Marketing Agreement is an unenforceable penalty. Whether a contractual provision is enforceable as liquidated damages or amounts to a penalty is a question of law.[12]

In Kansas, a liquidated-damages provision is enforceable, but a penalty provision is not.[13] "The distinction between a contractual penalty and a provision for liquidated damages is that a penalty, in effect, is a security for performance, while a provision for liquidated damages requires a sum certain to be paid in lieu of performance."[14]

First, the Court recognizes the Marketing Agreement styles the amount due to WACS in case of breach under Section 4 as "liquidated damages." "The Kansas Supreme Court has repeatedly stated that the terms 'penalty' and 'liquidated damages' no longer control when the facts demonstrate that the parties intended something different."[15] To assess what the parties intended, the Court applies the standard set for in *Beck v. Megli*.[16]

The two-pronged *Beck* test aims to distinguish a liquidated damages clause from an unenforceable penalty by asking: "(1) whether 'the amount stipulated is conscionable' and (2) whether 'the nature of the transaction is such that the amount of actual damages resulting from

---

[12] *Carrothers Constr. Co. v. City of S. Hutchinson*, 288 Kan. 743, 207 P.3d 231, 239 (2009).

[13] *Id. at* 241.

[14] *Id.* (citing *Erickson v. O'Leary*, 127 Kan. 12, 273 P. 414, 415 (1929)).

[15] *Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty., Kan. City, Kan.*, 2023 WL 4363439, at *13 (10th Cir. Jul. 6, 2023) (citing *Beck v. Megli*, 153 Kan. 721, 114 P.2d 305, 308 (1941); *Carrothers*, 207 P.3d at 241)).

[16] *Id.*  at *13 ("We can't stop at the terms 'penalty' and 'liquidated damages' to determine whether [a provision] is enforceable. Rather, we must apply the *Beck* test to determine whether the charges in [the provision] are reasonable and whether actual damages would be difficult to determine.").

default would not be easily and readily determinable.'"[17] The burden of proving a liquidated damages clause is an unenforceable penalty falls on the party challenging the provision.[18]

The first prong of the *Beck* test asks whether the stipulated amount is conscionable by comparing "the amount of the charges and the total value of the contract, as viewed from the time the contract was executed."[19] Here, the amount of charges under Section 4's liquidated damages provision is $1.032 million, 8% of the $12.9 million total sales price. And the minimum commission, or total value of the contract, is calculated using the same formula, amounting to $1.032 million. As can be seen, the liquidated damages provision gives Transworld the same amount as its minimum commission had a sale been consummated. WACS submits, and Transworld agrees, that this amounts to 100% of the contract value. This ratio is starkly higher than the liquidated-damages-to-contract-value ratios upheld by Kansas courts in other cases; there, ratios range from less than 1% to 5%.[20]

But the analysis under prong one of the *Beck* test is not entirely mathematical; "the charges must bear a reasonable relationship . . . to the damages which might be suffered."[21] WACS submits that the liquidated damages provision bears no relationship to the damages that Transworld might suffer in case of breach. Transworld argues that the liquidated damages provision is meant to take

---

[17] *Id.* at *12 (quoting *Beck*, 114 P.2d at 308) (citation omitted).

[18] *Carrothers*, 207 P.3d at 241.

[19] *Deffenbaugh,* 2023 WL 4363439, at *15.

[20] *See Beck*, 114 P.2d at 308 (finding a liquidated damages provision that was 5% of the total contract value reasonable); *Carrothers*, 207 P.3d at 241–42 (same at less than 3%); *White Lakes Shopping Ctr., Inc. v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 490 P.2d 609, 614 (1971) (same at 2%); *Deffenbaugh*, 2023 WL 4363439, at *16 (same at less than 1%).

[21] *Deffenbaugh*, 2023 WL 4363439, at *16 (quoting *Nat'l Co-op. Refinery Ass'n v. N. Ordnance, Inc.*, 238 F.2d 803, 807 (10th Cir. 1956)).

account of the sunk and opportunity costs it would incur in case of WACS's breach. In support of their arguments, each party cites the fact that Transworld offered an alternate fee and liquidated damages arrangement. WACS rejected the alternate arrangement in favor of the agreed-to provision under Section 4. Under the alternate arrangement, WACS would have made a nonrefundable advance payment of $75,000, and in exchange, Transworld's commission and corresponding liquidated damages calculation would have been 3% of the total sales price, rather than 8%.

WACS asserts that this alternate fee structure demonstrates that the liquidated damages provision bears no relation to the damages that might be suffered in case of breach. To illustrate, under the agreed-upon terms, the liquidated damages amount to over a million dollars; whereas, under the alternate arrangement, the liquidated damages provision would have given Transworld only $400,000. Because the same breach results in widely disparate damage awards under the two different arrangements, WACS argues that this provision cannot possibly be connected to damages reasonably expected from a breach.

In response, Transworld asserts that parties' intent is evident by the fact that WACS was offered another arrangement and rejected it in favor of the agreed-upon liquidated damages provision. As such, the provision should be enforceable. Transworld submits that the parties were represented by counsel and negotiated the terms of the agreement, and that WACS's attorney reviewed the initial draft of the agreement and recommended changes that were incorporated into the final document.

To start, whether the parties were represented or negotiated the liquidated damages provision is not a consideration under the *Beck* test.[22] Because the liquidated damages provision is fixed—providing no allowance for timing of breach—the Court finds it bears little relation to the damages Transworld might have expected in case of breach. A hypothetical is illustrative: Had WACS withdrawn their business for sale on day one of the Marketing Agreement, the liquidated damages clause would have awarded Transworld more than a million dollars. However, under this hypothetical, Transworld has minimal sunk or opportunity costs, and yet, gets a windfall. Transworld cites these factors—sunk and opportunity costs—as the factors it considered in calculating expected damages. As this hypothetical demonstrates, this liquidated damages provision does little to account for those expected damages. Thus, they do not "bear [a] reasonable relationship to the damages which may be expected to follow from the breach."[23] Because the liquidated-damages-to-contract-value ratio is 100% and the liquidated damages calculation bears little relation to anticipated damages, the Court finds that it is unconscionable and fails prong one of the *Beck* test.

Prong two of the *Beck* test asks whether the nature of the transaction is such that the amount of actual damages resulting from the default would not be easily and readily determinable.[24] To analyze this factor, Kansas courts ask whether "as part of the drafting process, the parties tried to estimate actual damages in the event of a breach."[25]

---

[22] *See id.* at *13 ("But that fact [provision was drafted by lawyers] alone wasn't determinative. Rather, the court used the *Beck* test to hold that the clause was a liquidated-damages provision." (citing *Unified Sch. Dist. No. 315, Thomas Cnty. v. DeWerff*, 6 Kan. App. 2d 277, 626 P.2d 1206, 1209–11 (1981)).

[23] *Nat'l Co-op. Refinery Ass'n*, 238 F.2d at 805 (citations omitted).

[24] *Deffenbaugh*, 2023 WL 4363439, at *12 (citing *Beck*, 114 P.2d at 308).

[25] *Id.* at *17 (citation omitted).

WACS again points to the disparity between the agreed-upon provision and the alternate arrangement offered by Transworld to demonstrate that the liquidated damages clause was not an estimate for actual damages in the event of breach. Transworld argues that the liquidated damages provision is meant to account for the difficulty in determining the damages from breach considering the time and effort it committed to the transaction and to account for the opportunities it must forgo because of its work for WACS.

Damages related to time and effort expended are not difficult to compute. In fact, under its breach of duty of good faith and fair dealing theory, Transworld provides an estimate of hours spent on the project and multiplies that number by its employees' customary rates. This provides a good start to estimating the time and effort Transworld committed to the transaction. Although, admittedly, lost opportunity costs are not as easily or readily determinable, the hypothetical described above demonstrates that the fixed nature of the liquidated damages provision does a poor job of accounting for those lost opportunity costs. But also, Transworld estimated its fees to be $900,000 when it set the WACS total sales price in the Marketing Agreement. It seems incomprehensible that a liquidated damages provision would give a non-breaching party more than the fees it estimated to incur had a sale been consummated.

Kansas courts will consider the public or private nature of a contract in addressing whether determining damages would be difficult.[26] In contracts that affect the public, damages are often difficult to determine, making a liquidated damages clause appropriate.[27] In contrast, this is a purely private contract. The private nature of the contract reduces the ripple effect of any breach,

---

[26] *Id.*

[27] *See Carrothers*, 207 P.3d at 242; *DeWerff*, 626 P.2d at 1210; *Deffenbaugh*, 2023 WL 4363439, at *12.

lending to more easily discernable damages. Finally, although not a necessary factor for a provision to be found enforceable, "many of the liquidated-damages provisions upheld by Kansas courts have included recitals about the difficulty in calculating actual damages.[28] The Marketing Agreement has no such recital. Because the types of damages anticipated from a breach of the Marketing Agreement are not difficult to account for, and it does not appear that the parties attempted to estimate actual damages resulting from such a breach, this clause fails prong two of the *Beck* test.

Although stylized as a liquidated-damages provision, this clause operates more like security for performance—that performance being the payment of commission—rather an exchange of a sum certain in lieu of performance. As such, the Court finds that this provision is an unenforceable penalty. Because this provision is an unenforceable penalty, should Transworld prevail on its breach of contract claim under Section 4(c), it may only recover actual damages that it can establish by proof.[29]

### 3. Add Backs and Section 7

WACS next seeks summary judgement on Transworld's breach of contract claim related to Section 7 of the Marketing Agreement. Transworld contends that WACS's disclosure of additional add backs after the Marketing Agreement was signed constitutes a breach of Section 7, which provides:

> 7. Seller represents and warrants the following;
>
> a. Seller, and Business's operation are in full compliance with all applicable laws, rules

---

[28] *Deffenbaugh*, 2023 WL 4363439, at *17.

[29] *See DeWerff*, 626 P.2d at 1210 ("Where actual damages are readily ascertainable, a provision purporting to be a liquidated damages clause will be construed as a penalty, with the injured party recovering only those damages established by proof.").

and regulations regarding the Business, and to the best of Seller's knowledge and belief there are no matters which would adversely affect the sale;

b. All facts, figures and additional documents about Business have been provided to Broker by Seller.

WACS asserts that it is entitled to summary judgment because Transworld has not identified any "law, rule, or regulation" with which WACS was out of compliance under Section 7(a) of the Marketing Agreement. Transworld's response narrows its claim to a breach of Section 7(b) of the Marketing Agreement, alleging WACS failed to provide "[a]ll facts, figures, and additional documents about the business." Thus, the Court grants WACS motion for summary judgment related to Section 7(a) of Transworld's claim, leaving only Transworld's allegation that WACS breached subsection 7(b) of the Marketing Agreement.

Transworld asserts that after signing the Marketing Agreement, WACS told Transworld about significantly more add backs. When it marketed WACS, Transworld's understanding of WACS's profitability was partially based on the initial add backs provided by WACS. Although large, Transworld considered these add backs a reasonable portion of the $2 million in annual profit claimed by WACS. But as more add backs and their details were disclosed, Transworld's understanding of WACS's profitability changed.

Specifically, the additional add back showed that several family members on WACS's payroll provided no services to WACS, that various non-WACS expenses including expenses related to the Baccis' 11 other businesses and personal remodeling expenses were run through WACS's tax returns. Transworld asserts that Christine Bacci communicated that adding non-WACS expenses to WACS's tax returns was a tax strategy.

The additional add backs and what Transworld characterizes as financial manipulation caused Transworld concern, leading it to believe that WACS's value was substantially lower than

the $12 million contemplated by the Marketing Agreement. Transworld came to this realization in the context of New Day conducting its due diligence review of WACS's financial statements pursuant to the LOI. Transworld spent a significant amount of time aiding WACS in cleaning up its books, and only after doing so did Transworld believe the $12 million asking price was justified. Specifically, Wes Schroeder spent a significant amount of time working on behalf of WACS, providing guidance on cleaning up the financial statements to eliminate the tax avoidance expenses. But Transworld asserts these add backs gave New Day concern, and although New Day remained interested in buying WACS, it was only after WACS significantly cleaned up its books.

WACS asserts it is entitled to summary judgment on Transworld's 7(b) claim because WACS provided Transworld all of its add backs and Transworld was aware of all WAC's add backs before signing the Marketing Agreement. With regard to timing, WACS asserts that it provided what was requested by Transworld when Transworld requested it. WACS asserts that before entering into the agreement, it provided Transworld with its profit and loss statements, income statements, balance sheets, and everything else Transworld requested from WACS's QuickBooks file. Specifically, on September 3, 2021, Christine Bacci emailed Transworld all of the add backs for WACS for 2019, 2020, and through September 2021. These add backs included various employees' salaries because, although these employees were paid by WACS, they provided services both to WACS and to other businesses owned by the Baccis. WACS contends, after disclosing the add backs, Transworld advised WACS that it should not charge non-WACS expenses to WACS and did nothing more.

WACS further asserts that the add backs identified decreased the expenses for a potential buyer and increased the value of WACS. The Court agrees on this point. It is difficult to see how identifying additional expenses that a new owner would not incur would do anything other than

increase WACS's value.

WACS argues that Transworld's knowledge of the add backs before the parties entered into the Marketing Agreement precludes it from claiming a breach under this provision, citing to *Pelischek v. Voshell*.[30] In that case, the parties entered into a contract for plaintiffs to purchase a trailer park in installment payments. After that contract was signed, the plaintiffs became aware that the septic system was discharging into a nearby creek. The Division of Sanitation of the Kansas State Board of Health notified plaintiffs that they needed to remedy the issue. The plaintiffs approached the defendant seeking to modify the installment contract to account for the expense required to fix the septic system. The parties entered into a new contract modifying the installment plan. Later, the plaintiffs filed suit alleging the defendant breached the contract by falsely warranting that the property was in compliance with the laws, rules, and regulations of the county, state, and federal government. The court found that the plaintiffs waived their right to complain about the conditions when they entered into a new contract with the defendants with knowledge of the violative conditions of the property.[31]

This case is distinguishable from *Pelischek*. Transworld alleges that it was not aware of the additional add backs when it entered into the Marketing Agreement with WACS. It is uncontroverted that WACS provided additional information about its add backs after the Marketing Agreement was signed. Had WACS and Transworld actually extended the Marketing Agreement, WACS might be right. However, although it is uncontroverted that Transworld sought to extend the Marketing Agreement with WACS, the parties never signed another contract after

---

[30] 181 Kan. 712, 313 P.2d 1105 (1957).

[31] *See id.* at 1109.

WACS provided its additional add backs.

Whether all of the add backs were known by Transworld before entering into the Marketing Agreement is genuinely disputed. Further, the effect of the additional add backs on Transworld's ability to market WACS and whether the additional add backs are "facts, figures, [or] additional documents" contemplated by Section 7(b) of the Marketing Agreement is in genuine dispute. Because these questions form the basis of Transworld's breach of contract claim under Section 7(b), they are material.

### 4. Damages Under Section 7

WACS asserts that even if there is a genuine issue of material fact as to Transworld's allegation that WACS breached Section 7 of the Marketing Agreement, summary judgement is proper because Transworld cannot prove damages related to this claim. Demonstrating that plaintiff suffered damages as a result of the breach is an element of a breach of contract claim.[32]

In the Pretrial Order, Transworld identifies that it seeks to recover under Section 4's liquidated damages clause for a breach of Section 7. However, Section 4's liquidated damages clause is only triggered by an event described in Section 4. It is inapplicable to Section 7. Thus, even if the Court had found the liquidated damages clause enforceable, Transworld could not recover liquidated damages for a breach under Section 7. For that reason, the Court grants WACS's motion for summary judgment related to Transworld's effort to recover under Section 4's liquidated damages clause for a breach of Section 7 of the Marketing Agreement.

Next, Transworld seeks to recover the reasonable value of the services that it provided to WACS. WACS argues that Transworld cannot recover damages for the reasonable value of its

---

[32] *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013).

services because the nature of a commission contract is one in which the broker only gets paid when a sale happens. Therefore, even in a breach, the broker cannot recover. WACS fails to cite any authority for this proposition. Transworld responds that the "law clearly permits approximations as to the extent of damage, providing the fact of damage or lost profits is certain."[33] Thus, even though this is a commission contract, to the extent Transworld can prove damages resulting from an alleged breach, it should be permitted to recover.

But also, WACS asserts that Transworld cannot establish damages because its reasonable value of services theory of recovery was included in the Pretrial Order for the first time. The pretrial order is the controlling document for trial and "the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."[34] But the Court does "not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order, . . . [s]uch a practice deprives one's adversary of fair notice [and] possible discovery."[35] In its Complaint, Transworld identifies "liquidated damages as set forth in the Marketing Agreement" as its prayer for relief. In its initial disclosures, in response to WAC's request for a computation of each category of damages, Transworld responded that it sought "[p]ursuant to the Marketing Agreement, . . . liquidated damages equal to 8% of the Total Sales Price of $12,900,000 or $1,032,000." And again, in response to an interrogatory, Transworld answered that it sought only to recover under the liquidated damages provision.

---

[33] *Eccher v. Small Bus. Admin.*, 643 F.2d 1388, 1392 (10th Cir. 1981).

[34] *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[35] *Id.*

In the Pretrial Order, WACS objected to the addition of Transworld's reasonable value of services category of damages. WACS asserts that Transworld's failure to include this category of damages up until the Pretrial Order should preclude Transworld from recovering this type of damages. In its response to WACS's Motion for Summary Judgment, Transworld attached affidavits from Gary and Wesley Schroeder—both dated June 3, 2024, more than a month after the Pretrial Order was filed—that include a calculation of the reasonable value of Transworld's services to WACS. But Transworld makes no substantive response to WACS's argument and provides no explanation for the delayed inclusion of an additional category of damages.

Transworld was required by Fed. R. Civ. P. 26(a)(1)(A)(iii) to disclose a "computation of each category of damages claimed" as well as "documents or other evidentiary material" demonstrating the extent of "injuries suffered."[36] A failure to provide information required by Rule 26(a) prevents a party from "us[ing] that information . . . on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[37] Here, Transworld failed to provide notice that this was a category of damages it sought up until the Pretrial Order. Further, it failed to provide evidence supporting such a claim until more than a month after the Pretrial Order was issued. Transworld did not provide a substantive response that could cause this Court to find the delay was "substantially justified" or "harmless."[38] Accordingly, Transworld may not seek

---

[36] Fed. R. Civ. P. 26(a)(1)(A)(iii).

[37] Fed. R. Civ. P. 37(c)(1).

[38] *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008) ("The exclusion of evidence presented out of time is 'automatic and mandatory' unless the violation was either justified or harmless." (citation omitted)).

recovery of the reasonable value of its services even if it were to demonstrate the WACS breached Section 7 of the Marketing Agreement.

Because the liquidated damages provision is inapplicable for a breach under Section 7 of the Marketing Agreement, and Transworld may not recover the reasonable value of its services under such a breach, it has not shown that it suffered damages for an alleged breach of Section 7. Because establishing damages are an essential element of Transworld's breach of contract claim, and it cannot show recoverable damages, summary judgment is appropriate.[39]

## B.    Good Faith and Fair Dealing

Transworld's second theory of recovery is that WACS violated its duty of good faith and fair dealing by breaching the Marketing Agreement which prevented Transworld from receiving the fruits of the agreement and labor performed under the agreement. WACS moves for summary judgment, submitting that it did not breach the contract.

"Inherent in virtually every contract . . . is the duty of all parties to perform their contractual obligations in good faith."[40] "Breach of the implied covenant of good faith and fair dealing is not a separate claim."[41] "Rather, it is just another theory of breach of contract."[42] Thus, to assert a cause of action for breach of the duty of good faith and fair dealing under contract law, one must: "(1) plead a cause of action for breach of contract, not a separate cause of action for

---

[39] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) ("To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." (citation omitted)).

[40] *Progressive Nw. Ins. Co. v. Gant*, 2018 WL 3472796, at *19 (D. Kan. July 19, 2018) (quoting *Est. of Draper v. Bank of Am., N.A.*, 288 Kan. 510, 205 P.3d 698, 710 (2009)).

[41] *H&C Animal Health, LLC v. Ceva Animal Health*, 499 F. Supp. 3d 920, 940 (D. Kan. 2020) (further citations and quotations omitted).

[42] *Bad Rhino Games, LLC v. Turn Me Up Games, Inc.*, 2023 WL 7018649, at *4 (D. Kan. Oct. 25, 2023).

breach of duty of good faith, and (2) point to a term of the contract which the defendant allegedly violated by failing to abide by the good faith spirit of that term."[43]

The facts underlying the first element of Transworld's breach of the duty of good faith and fair dealing theory are the same as its breach of contract claim—WACS breached Sections 4 and 7 of the Marketing Agreement. For the same reasons the Court cannot grant summary judgment on Transworld's Section 4 breach of contract claim, the Court cannot grant summary judgment here. And for the same reasons the Court grants summary judgment on Transworld's Section 7 breach of contract claim, the Court grants summary judgment here. Accordingly, WACS's request for summary judgment on Transworld's good faith and fair dealing theory under Section 4 is denied but granted as to Section 7.

## C.    Unjust Enrichment

Transworld seeks recovery under a third, alternate theory: unjust enrichment/quantum meruit. WACS submits it is entitled to summary judgment because there is an express contract between the parties. "Courts applying Kansas law have concluded that quantum meruit and restitution are not available theories of recovery when a valid, written contract addressing the issue exists."[44] Transworld did not respond to WACS's request for summary judgment on this theory. Because the Marketing Agreement constitutes an express contract between the parties and Transworld did not respond, summary judgment is appropriate.[45]

---

[43] *Terra Venture, Inc. v. JDN Real Est.-Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006) (citing *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996)).

[44] *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, 934 F. Supp. 1270, 1275 (D. Kan. 1996).

[45] *See Rupe v. Triton Oil & Gas Corp.*, 806 F. Supp. 1495, 1504 (D. Kan. 1992) (granting summary judgment when plaintiff failed to respond to the defendant's argument that the existence of a written contract precluded the plaintiff from recovering on an unjust enrichment theory).

### IV. Conclusion

In sum the Court grants summary judgment on Defendants' motion that the liquidated damages clause is an unenforceable penalty, Defendants' motion for summary judgment on Plaintiff's breach of Section 7 of the Marketing Agreement, Defendant's motion for summary judgment on Plaintiff's breach of the duty of good faith and fair dealing claim under Section 7, and Defendants' motion for summary judgment on Plaintiff's unjust enrichment/quantum meruit theory.

The Court denies Defendants' motion for summary judgment on Plaintiff's breach of Section 4(c) of the Marketing Agreement and Plaintiff's breach of the duty of good faith and fair dealing as to Section 4(c) of the Marketing Agreement.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

Dated this 5th day of November, 2024.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE